FILED

2014 Oct-28  PM 03:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SANDRA JONES, as personal representative of, and on behalf of the survivors of, CHRIS JONES, deceased, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. CV-12-S-96-NE |
| vs. | ) ) | |
| CITY OF ALBERTVILLE, ALABAMA; NATHAN SHIPP; MICHAEL MAHER; and DOUG POLLARD, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff, Sandra Jones, is the widow of Chris Jones, who was shot and killed by an Albertville, Alabama Police Officer. Her complaint alleged claims against Officers Michael Maher and Nathan Shipp, the City of Albertville, and Albertville Police Chief Doug Pollard,[1] but she subsequently dismissed her claims against the City and Chief Pollard.[2] The action presently is before the court on the motion for summary judgment, and motion to exclude the testimony of plaintiff's expert, filed by

---

[1] *See* doc. no. 1 (Complaint), ¶¶ 3-7, 15-33. The complaint spelled Nathan Shipp's surname as "Ship," but most of the parties' subsequent pleadings spell his last name as "Shipp."

[2] Doc. no. 19 (Consent Motion to Dismiss); doc. no. 21 (Order Dismissing Fewer than All Defendants).

defendants Maher and Shipp.[3]  Plaintiff's responsive brief conceded that Nathan Shipp "is entitled to the summary judgment he seeks."[4]   Thus, the following opinion considers the subject motions only as they relate to plaintiff's claims against the remaining defendant, Officer Michael Maher.

Upon consideration of the pleadings, briefs, evidentiary submissions, and oral arguments of counsel, this court concludes that both motions are due to be granted, but only in part.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Hayes v. City of*

---

[3] *See* doc. nos. 37 (Motion for Summary Judgment) and 39 (Motion to Exclude).

[4] Doc. no. 41 (Response to Summary Judgment), at 1.

*Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied).  *see also Saucier v. Katz*, 533 U.S. 204, 201 (2001) ("A court required to rule upon the qualified immunity issue must consider . . . this threshold question: *Taken in the light most favorable to the party asserting the injury*, do the facts alleged show the officers conduct violated a constitutional right?") (emphasis supplied).

## II.  SUMMARY OF FACTS

The following statements are the "facts" for summary judgment purposes only, and may not be the actual facts.  *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).  All reasonable doubts have been resolved in favor of plaintiff, the nonmoving party.  *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).

Plaintiff and her husband, Chris Jones, drove to 272 Old Glory Lane in Albertville, Alabama on the night of Monday, March 21, 2011, for the purpose of visiting their daughter, Fendi, who then was residing at that location with her boyfriend, Zach Collins.[5]  Five persons were present when plaintiff and her husband arrived:  Fendi Jones; Zach Collins; Greg Logan; Allison Lewis; and Brandon Jones (who was not related to plaintiff, her husband, or Fendi Jones).[6]  During their visit, Chris Jones consumed a great deal of alcoholic liquor and beverages.[7]  His drunken behavior upset plaintiff, so much so that she telephoned Adam Chandler, her son from a previous marriage, and asked him to come for her.[8]  At some point thereafter, Chris and Brandon Jones began to fight.  Chris Jones brandished a knife during the brawl.[9] Fendi telephoned 911,[10] and asked the operator to send police because "people [were] fighting" and attempting "to kill each other"; she added that one of them had "pulled out a knife," and the persons involved were drunk.[11]

---

[5] Doc. no. 37-1 (Collins Deposition), at 14; doc. no. 37-2 (Logan Deposition), at 10, 13-15; and doc. no. 37-3 (Fendi Jones Deposition), at 12-14.

[6] Doc. no. 37-3 (Fendi Jones Deposition), at 14-15, 22.

[7] *See* doc. no. 37-1 (Collins Deposition), at 21, 35-36; doc. no. 37-2 (Logan Deposition), at 18-19, 45.

[8] Doc. no. 37-4 (Sandra Jones Deposition), at 12, 57, 68-69.

[9] Doc. no. 37-1 (Collins Deposition), at 20-23; doc. no. 37-2 (Logan Deposition), at 15-16, 21.

[10] Doc. 37-3 (Fendi Jones Deposition), at 23, 37.

[11] Exhibit E, on file with the clerks office, audio file 1 at 0:28, 2:07, 2:52 (alterations supplied).

The 911 operator dispatched Albertville Police Officers Josh Isbell and Nathan Shipp in response to the call,[12] telling them that several people were fighting and that at least one had a knife.[13]  Officer Michael Maher heard the dispatch on his home radio and also responded, even though he had not been directed to do so, because he lived only three miles from Zach Collins's house.[14]

The fight escalated after Fendi Jones placed the 911 call.  Chris Jones eventually got into his pickup truck and attempted to run over Zach Collins, who had twice disarmed him, but in his intoxicated state Jones missed Collins and rammed the house instead.[15]  As Chris Jones was backing his truck away from the house, Officers Isbell and Shipp arrived in separate police cruisers.  Officer Maher also arrived at about the same time, but positioned his patrol car at the entrance to the subdivision.[16]

Jones fled the scene in his pickup truck, and led all three officers in a lengthy pursuit.  During the chase, Jones drove recklessly, at speeds often exceeding 70 miles per hour, across several lawns, in and out of ditches on each side of the road, and swerved back and forth across both lanes.  He failed to stop for at least five stop

---

[12] Doc. no. 37-5 (Isbell Deposition), at 10.

[13] *Id.*

[14] Doc. no. 37-7 (Maher Deposition), at 40-41.

[15] Doc. no. 37-2 (Logan Deposition), at 21-25.

[16] Doc. no. 37-7 (Maher Deposition), at 41-42.

signs.[17]   At one point, he applied his brakes suddenly and unexpectedly, causing Officer Isbell to turn his patrol car sharply to the right, in an attempt to avoid a collision.  He only partially succeeded.  Isbell's cruiser scraped the rear of Jones's truck,[18] and ricocheted off the roadway into a ditch.[19]  The resulting crash disabled Isbell's patrol car, and Officer Shipp had to assume the lead position as the pursuit continued, with Officer Maher bringing up the rear.[20]

Jones continued his reckless course for several more minutes, swerving back and forth across both lanes, running stop signs, and speeding through an intersection.[21] Eventually he came to another sudden stop,[22] forcing Officer Shipp to come to a quick stop close behind the rear of Jones's truck.[23]  Officer Maher maneuvered his cruiser around the driver's side of Shipp's patrol car, in an attempt to box Jones in, between the two police cars.[24]  As he pulled even with the front of Shipp's vehicle, however,

[17] *See* Exhibit J (Shipp Dash Cam), on file with the clerks office;  Exhibit K (Maher Dash Cam), on file with the clerks office; and Exhibit L (Isbell Dash Cam), on file with the clerks office.

[18] Exhibit L (Isbell Dash Cam), on file with the clerks office, at 2:59; doc. no. 37-5 (Isbell Deposition), at 21.

[19] Doc. no. 37-5 (Isbell Deposition), at 22-23.

[20] Doc. no. 37-6 (Shipp Deposition), at 18.

[21] Exhibit J (Shipp Dash Cam), on file with the clerks office, at 2:45-5:20.

[22] *Id.* at 5:20.

[23] *Id.* at 5:19.

[24] Exhibit K (Maher Dash Cam), on file with the clerks office, at 5:08; doc. no. 37-11 (ABI Report), at ECF 18.  "ECF" is the acronym for "Electronic Case Filing," a system that allows parties to file and serve documents electronically.  *See Atterbury v. Foulk*, No. C-07-6256 MHP, 2009 WL 4723547, *6 n.6 (N.D. Cal. Dec. 8, 2009).  Bluebook Rule 7.1.4 *permits* citations to the "page numbers generated by the ECF header."  *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 257 n.5 (D.D.C.

the reverse lights on Jones's pickup truck suddenly lit up, and the truck shot backwards, slamming into the front of Shipp's patrol car.[25]  The truck rode up, over the top of Shipp's "push bumper" and hood, and came to a rest with its rear wheels off the ground.[26]  The truck then rolled back forward, but its rear bumper became entangled with Shipp's push bumper.[27]

At that moment, Shipp began to fire his duty weapon at Jones through the front windshield of his patrol car.[28]  He discharged all fifteen rounds in the pistol's clip within six seconds after opening fire,[29] but none of the bullets struck Jones, apparently because he was not sitting in an upright position behind the steering wheel of his truck, but lying prone across the passenger seat.[30]

Officer Maher began firing his pistol at Jones as soon as Shipp discharged all

---

2011) (citing *The Bluebook: A Uniform System of Citation* R. B. 7.1.4, at 21 (Columbia Law Review Ass'n *et al.*, 19th ed. 2010)).  Even so, the Bluebook recommends "against citation to ECF pagination in lieu of original pagination."  *Wilson*, 772 F. Supp. 2d at 257 n.5.  Thus, unless stated otherwise, this court will cite the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number with the letters "ECF."

[25] Exhibit J (Shipp Dash Cam), on file with the clerks office, at 5:23.

[26] Doc. no. 37-7 (Maher Deposition), at 49.

[27] Exhibit J (Shipp Dash Cam), on file with the clerks office, at 5:26; doc. no. 37-11 (Thomas Deposition), at 20-21.

[28] Exhibit J (Shipp Dash Cam), on file with the clerks office, at 5:27.

[29] *Id.* at 5:27-5:33.

[30] Doc. no. 37-9 (Gowitt Deposition), at 25-27.

of the rounds in his weapon.[31]  He discharged thirteen shots within five seconds and then paused.[32]  As Maher approached the truck on the driver's side, with his weapon aimed at the cab, Jones suddenly sat up behind the steering wheel, and Maher ripped off two more shots.[33]  That occurred a little more than seven seconds after the end of Maher's initial volley.  The engine of Jones's truck still was running.[34]  Consequently, Maher opened the driver's door, reached into the truck, and removed the ignition key.[35]  Neither Shipp nor Maher had issued any verbal commands to Jones before discharging their weapons.[36]

It later was determined that Jones had sustained three gunshot wounds, and that all of them had been inflicted by bullets fired from Officer Maher's duty weapon.[37] Only one of the wounds was fatal: the shot that entered Jones's chest and pierced his

---

[31] Exhibit J (Shipp Dash Cam), on file with the clerks office, at 5:33; doc. no. 37-7 (Maher Deposition), at 21.

[32] See Exhibit J (Shipp Dash Cam), on file with the clerks office, at 5:33-5:38; Exhibit K (Maher Dash Cam), on file with the clerks office, at 5:28.

[33] Doc. no. 37-7 (Maher Deposition), at 26; Exhibit J (Shipp Dash Cam), on file with the clerks office, at 5:44.  According to Officer Maher: "I had about three seconds to make that decision . . . ."  Doc. no. 37-7 (Maher Deposition), at 53.

[34] Doc. no. 37-7 (Maher Deposition), at 26.

[35] Id. at 38-39. Officer Maher testified that he also shifted the truck from reverse to park, id., but that is disputed by plaintiff in light of the video evidence. See Exhibit J (Shipp Dash Cam), on file with the clerks office, at 5:54.

[36] Doc. no. 37-7 (Maher Deposition), at 34.

[37] Doc. no. 37-9 (Gowitt Deposition), at 26.

lung.[38]  The order in which the three wounds were inflicted is not known.[39]

### III.  MOTION TO EXCLUDE

Defendant contends that the testimony of plaintiff's proposed expert witness, Daniel Busken, Chief of the Greenville, Texas, Police Department, should be excluded or limited because he is not qualified as an expert, his opinions are based on an improper foundation, and his testimony would invade the province of the jury.[40] Analysis of that motion begins with Federal Rule of Evidence 702, which provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.   Courts are required to conduct an exacting analysis of the

---

[38] *Id.* at 12-13.

[39] *Id.*

[40] Doc. no. 39 (Motion to Exclude), at 1-2, 6-26.

foundations of the witness's opinions, "to ensure they meet the standards for admissibility under Rule 702." *United States v. Abreu*, 406 F.3d 1304, 1306 (11th Cir. 2005) (quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (internal quotation marks and emphasis omitted)).

> [T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (alteration supplied).

"The inquiry . . . is a flexible one," because "[m]any factors will bear on the inquiry, and . . . [there is no] definitive checklist or test." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993) (alterations supplied). Factors that may be relevant include:

> (1) whether the theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) in the case of a particular . . . technique, the known or potential rate of error, and (4) whether the theory or technique is generally accepted by the relevant . . . community.

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (internal quotation marks and alterations omitted).[41]

---

[41] Additional factors that may be taken into account include:

> (1) Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or

A.    **Busken's Background and Qualifications**[42]

Daniel Busken has almost thirty years of law enforcement experience in the states of Missouri, Alabama, and Texas.  He began his career in 1983, in University City, Missouri, where he served as a police officer, field-training instructor, and investigator.  During his tenure there, Busken also served as a field commander and deputy director of a narcotics task force.  He left that municipality during December of 1992, after accepting the position of Chief of Police in Crystal City, Missouri:  a position that he held for seven years.  He resigned that position in January of 2000, in order to accept the position of Chief of Police in Madison, Alabama, where he served for nine years, leaving in February of 2009.  He became Chief of Police in Greenville, Texas in September of 2010.

Busken developed policies for the use of force and pursuit procedures while serving as the Chief of Police for the three municipalities identified in the preceding

whether he has developed his opinion expressly for purposes of testifying;

(2) Whether the expert has unjustifiably extrapolated from an accepted to an unfounded conclusion;

(3) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

(4) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702 advisory committee's note to 2000 amendments (internal citations omitted).

[42] All information in this section comes from Busken's Expert Report, doc. no. 41-5, at 2.

paragraph, and reviewed compliance with those policies.  Those reviews generally required him to investigate the events preceding an officer's use of force or pursuit of a fleeing suspect, the actions of the offenders and officers and, ultimately, to determine whether the outcome complied with relevant departmental policies.

In addition to his thirty years of on-the-job experience in police procedures, Busken has some education and training in law enforcement.  He completed 33 hours of course credit toward a Doctorate degree in Business and Criminal Justice at Northcentral University, and he received training at the FBI National Academy's Law Enforcement Executive Development Seminar.

## B.   **Busken's Expert Report**

The written report required by Federal Rule of Civil Procedure 26(a)(2)(B) is quoted in the Appendix to this opinion.

## C.   **Qualifications**

Officer Maher contends that Busken is not qualified to testify as an expert because he does not have any special education or training in police practices, tactics, or deadly force decision making, his experience in pursuits and the use of force as a law enforcement officer is limited, and his experience as Chief of Police is not sufficient.[43]

---

[43] Doc. no. 39 (Motion to Exclude), at 6-9.

As previously noted, however, more than twenty of Busken's thirty years of law enforcement experience was spent as a Chief of Police. As such, he participated in numerous investigations of pursuits and the use of force.[44] Therefore, he is qualified to offer testimony concerning relevant, generally-accepted police standards and procedures, and to state whether, in his opinion, Officer Maher adhered to such standards. *See* Fed. R. Evid. 702(a) (providing that a witness may be qualified as an expert by virtue of his "knowledge, skill, experience, training, or education").

**D**.   **Opinion on Adherence to Reaction Times Policies**

Busken opines that Officers Isbell and Shipp failed to adhere to the provisions of the Albertville Police Department's Policies and Procedures Manual related to reaction time and reactionary gaps because their pursuit tactics put too little distance between them and Jones's pickup truck during the high-speed chase.[45]

> Officer Isbell's police vehicle was too close to Jones' truck during the pursuit. This prohibited Officer Isbell from reacting to Jones' maneuvers and avoiding a collision. Later in the incident, when Jones stopped the truck, Officer Shipp was too close to Jones' truck, leaving Shipp with no Reactionary Gap. Some may argue this portion of policy is not relevant during a vehicular pursuit; however, the Albertville policy clearly states Reaction Time and Reactionary Gap are relevant "during all police contacts".

Doc. no. 41-5 (Busken Report), at 3.[46] Officer Maher contends that the foregoing

---

[44] Doc. no. 41-5 (Busken Report), at 2.

[45] Doc. no. 41-5 (Busken Report), at 3.

[46] *See also* the Appendix, *infra* at 45.

13

opinion is based upon unsound methodology.[47]   He argues that Busken cannot articulate how the pursuit would have turned out differently, *if* Officer Shipp's police cruiser had been further away from Jones's truck when Jones suddenly, and unexpectedly, applied his brakes.  Maher also contends that Busken contradicted his own report during his deposition.[48]

This contested opinion relates only to the actions of Officer Shipp, and plaintiff has conceded that Shipp is entitled to summary judgment.[49]   Accordingly, this aspect of the motion to exclude is due to be denied as moot.

## E.    Opinions Related to Officer Shipp's Push Bumper and Jones's Truck

Busken also opined that:

Review of the video from Officer Shipp's patrol vehicle shows Jones back his truck into the front of Shipp's vehicle.  While the police vehicle is stationary, the truck continues and the rear of the truck "rides up" slightly onto the push-bumper and hood of Shipp's patrol car.  The push bumper stopped the backward motion of Jones' truck, *disabled Jones' truck*[,] *preventing it from continuing its backward movement, and ended the immediate threat of death or serious physical injury*.  Jones' truck appears to be stuck on the push bumper preventing the truck from moving backward any further.  . . .

.  .  .  .

*I do not think the lethal force used by Officer Shipp was reasonable because Jones backed into the strongest part of the police car.*  Officer

[47] Doc. no. 39 (Motion to Exclude), at 10-15.

[48] *Id.* at 12-15.

[49] Doc. no. 41 (Response to Summary Judgment), at 1.

> Maher reinforced this opinion in his deposition.  "You cannot disable a vehicle by shooting at the engine block, it's the strongest part on the vehicle" (p. 58).  Jones backed into the engine compartment.  The front of Shipp's police vehicle was fortified by what is referred to as a "push bumper".  Shipp was aware of the protection provided by a push bumper. In his deposition, referring to the push bumper, Shipp said, "It's a metal push bar that we use to — that kind of protects the front end of the car" (p. 84).  A manufacturer website, Go Rhino — Public Safety Division (www.gorhinopd.com/testimonials.aspx), offers several testimonials of police officers throughout the United States.  These stories prove the push bumper absorbs a lot of the impact, allowed an officer to walk away from a head-on collision, and another push bumper saved the officer from serious injury or death.

Doc. no. 41-5 (Busken Report), at 4-5 (emphasis and alteration supplied).[50]

Officer Maher contends that Busken's opinion that Officer Shipp was adequately protected by the push bumper on the front of his police cruiser has no factual foundation.[51]  *See* Fed. R. Evid. 702(b) (an expert witness may testify in the form of an opinion *if* "the testimony is based on *sufficient facts or data*") (emphasis supplied).  This court agrees.

Busken testified during deposition that, in his opinion, it was unreasonable for Officer Maher to attempt to protect Officer Shipp by shooting Jones.[52]  Busken based his opinion upon his observation that Jones was "backing into the strongest part of [Officer Shipp's] police car . . . that's fortified by a push bumper.  And he gets hung

---

[50] See also the Appendix, *infra* at 47 and 49-50.

[51] Doc. no. 39 (Motion to Exclude), at 15-18.

[52] Doc. no. 37-15 (Busken Deposition), at 68.

up on it, and then he moves forward.  And in my opinion the threat subsides at that point,"[53] because Jones's truck then was (in Busken's opinion) "disabled."[54]

Busken admits that he is not an engineer,[55] he does not know how the push bumper was attached to the police cruiser,[56] and he does not even know the company that manufactured the bumper attached to Officer Shipp's cruiser.[57]  His opinion, instead, is based upon police officer "testimonials" (*i.e.,* layperson opinions) he reviewed on the website for "Go Rhino" — a company that sells push bumpers, but not necessarily the company that manufactured the bumper installed on Officer Shipp's cruiser.[58]

While Busken's thirty years of law enforcement experience is admirable, he lacks the foundation necessary to render opinions based upon the "strength" of Officer Shipp's push bumper.  Moreover, Busken admitted that he did not know whether Jones's truck could have overpowered the push bumper, if Jones had attempted to back his truck into Shipp's cruiser a second time:

> Q.    Well, you said you're not an engineer.  Neither you nor I nor anyone else knows if he would have backed up it wouldn't have

---

[53] *Id.* at 69-70.

[54] *Id.* at 72-73.

[55] *Id.* at 73.

[56] *Id.* at 74.

[57] *Id.* at 32-33.

[58] Doc. no. 37-15 (Busken Deposition), at 32, 134.

overpowered that bumper and come right into Ship[p]'s windshield.  You don't know that?

A.   Well, you don't know that, but you've already —

Q.   Well, you don't know that.

A.   Well, when I said "You don't know that,["] I meant myself.  You don't know it either, but, you know, what's the best predictor of the future is what has happened in the past, and you've had it happen right in front of you here.[59]  It stopped it.  Okay.

Doc. no. 37-15 (Busken Deposition), at 79 (alterations supplied).  In addition, Busken did not know the engine size or capabilities of Jones's pickup truck.[60]  Without that knowledge, it would be impossible for him to opine that Jones's truck was "disabled," and incapable of being operated further.

Thus, both of his contested opinions — that the push bumper was strong enough to resist Jones's truck, and that the truck was "disabled" — lack a sufficient factual foundation and are due to be excluded.

## F.   The Reasonableness of Officer Maher's Use of Lethal Force

Busken's opines that Officer Maher's use of lethal force was not "reasonable."

---

[59] Interestingly, if past behavior is the "best predictor of the future," as Busken claims, it was reasonable for Officer Maher to believe that Jones would attempt to back his truck over Officer Shipp's hood a second time.  In fact, Busken conceded that it was not unreasonable to believe that Jones would have attempted to back his truck into Officer Shipp's patrol car a second time.  *Id.* at 81 ("I don't think it's unreasonable to think gosh, he's fixing to do that to them again.").  Further, Busken agrees that as long as Jones was in his truck, the motor was running, and he was capable of driving, he posed a risk to the public in general.  *Id.* at 132.

[60] *Id.* at 116.

That conclusion is based, in part, on his opinion that Chris Jones's truck was "disabled."

> I do not think Officer Maher's use of lethal force was reasonable because, according to Maher's deposition (p. 21), the sole reason Maher fired at Jones was because Maher believed Jones presented a threat to Officer Shipp.  Jones was backing his truck up onto Shipp's police vehicle.  Maher's account is contrary to the video evidence.  Shipp's in-car camera clearly shows Officer Maher begin the use of lethal force (shooting) after the truck is disabled by the push bumper, after the truck is disengaged from the front of the patrol vehicle, and after the immediate threat of death or serious injury subsided.

Doc. no. 41-5 (Busken Report), at 6.[61]

The court previously excluded Busken's opinion that Jones's truck was "disabled."  It follows, therefore, that this opinion, based upon the witness's factually unsupported conclusions about the status and capabilities of Jones's truck, should also be excluded.[62]

---

[61] See also the Appendix, *infra* at 50-51.

[62] Busken also contends that Maher fired his initial volley, "*not because* Maher perceived any threat posed by Jones, but because he heard gunshots behind him and [he] thought the shots were coming from Officer Shipp."  Doc. no. 41-5 (Busken Report), at 6 (emphasis and alteration supplied).  It is not clear whether Busken used that contention to support his opinion that Maher acted unreasonably.  The contention relies upon an Alabama Bureau of Investigation Report that provided:

> As MAHER came around the patrol vehicle he saw the reverse lights of the truck come on and saw the truck drive in reverse onto the hood of SHIPP's patrol car. MAHER states he remembered seeing the driver of the truck looking over his right shoulder with his right hand across the back of the seat, the driver then turned and looked to his left toward MAHER.  MAHER said by this time he was stopping his vehicle and slightly ahead of Officer SHIPP's car when he heard gunshots behind him.  MAHER states he thought the shots were coming from Officer SHIPP. MAHER then exited his vehicle and fired his duty weapon over the top of his car at

**G**.     **The Contention That Busken's Opinion Usurps the Role of the Jury**

Officer Maher also contends that Busken's testimony usurps the role of the jury,

because he reached the ultimate issue when he opined that Officer Maher acted

"unreasonably."  Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an opinion
> or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized
> > knowledge *will help the trier of fact to understand the evidence or
> > to determine a fact in issue*; . . . .

Fed. R. Evid. 702(a) (emphasis supplied).  At the summary judgment stage, however,

once the court has "determined the relevant set of facts and drawn all inferences in

favor of the nonmoving party *to the extent supportable by the record*, the

reasonableness of [the officer's] actions . . . is a pure question of law.'"  *Penley v.

Eslinger*, 605 F.3d 843, 848-49 (11th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S.

───────────────────────────

the driver of the truck.

Doc. no. 37-11 (ABI Report), at ECF 18.  Nothing in that report establishes that Officer Maher
began firing his weapon *because* he heard gunshots behind him.  Busken's contention regarding
Maher's motivation for firing his initial volley of shots is based upon his supposition and lacks a
sufficient factual foundation.  Moreover, even if there was evidence that Officer Maher fired his duty
weapon only *because* Officer Shipp fired his, Busken's contention regarding Maher's initial volley
of shots relates to Maher's motivations.  "[T]he question is whether the officers' actions are
'objectively reasonable' in light of the facts and circumstances confronting them, *without regard to
their underlying intent or motivation*."  *Graham v. Connor*, 490 U.S. 386, 397 (1989) (emphasis and
alteration supplied).  Accordingly, Busken's opinion applies an incorrect legal standard if it relies
upon the contention that Maher fired his duty weapon because Shipp fired his.

372, 396 (2007)) (emphasis, alteration, and ellipsis in original).

Here, Busken's opinions as to the reasonableness of Officer Maher's actions will not assist the trier of fact, because it is the role of the judge, and not an expert witness, to instruct the jury on the applicable principles of law.  As the Eleventh Circuit has stated:  "'Domestic law is properly considered and determined by the court whose function it is to instruct the jury on the law; domestic law is not to be presented through testimony and argued to the jury as a question of fact.'"  *United States v. House*, 684 F.3d 1173, 1209 (11th Cir. 2012) (quoting *United States v. Oliveros*, 275 F.3d 1299, 1306-07 (11th Cir. 2001)).  In other words, "[a]n expert may not . . . merely tell the jury what result to reach," and "[a] witness also may not testify to the legal implications of conduct."  *Montgomery v. Aetna Casualty & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (citations omitted, alterations supplied).  Instead, "the court must be the jury's only source of law."  *Id.* (citations omitted).

Although plaintiff does not expressly concede this issue, neither does she contest it.[63]  Instead, she asks this court to limit — rather than exclude — Busken's testimony to an explanation of the relevant policy standards, and whether Maher adhered to those standards.[64]  Officer Maher admits that Busken should be permitted to "explain to the jury what the relevant police standards are," and whether Officer

---

[63] *See* doc. no. 40 (Response to Motion to Exclude), at 20-21.
[64] *Id.* at 20.

Maher adhered to those standards.[65]  The court agrees, and will consider Busken's

opinions only to the extent that they explain whether Officer Maher adhered to

relevant standards, and to the extent that this court has not already determined that an

opinion is due to be excluded.[66]

## IV.  DISCUSSION

Plaintiff asserts two claims against Officer Michael Maher:  a federal claim,

asserted under 42 U.S.C. § 1983, that Maher employed excessive or unreasonable

force in violation of rights guaranteed to Chris Jones by the Fourth Amendment to the

United States Constitution;[67] and, a supplemental state-law claim, asserted under 28

U.S.C. § 1367, and based upon Alabama's wrongful death statute, Ala. Code § 6-5-

410 (1975).[68]

## A.    Qualified Immunity

---

[65] Doc. no. 39 (Motion to Exclude), at 23.

[66] Plaintiff also asks the court to allow her to present Busken's opinion testimony in the form of a hypothetical pursuant to Eleventh Circuit precedent in *Samples v. City of Atlanta*, 916 F.2d 1548, 1551 (11th Cir. 1990).  Because the court ultimately determines that defendants' motion for summary judgment is due to be granted, the court will not consider plaintiff's request.

[67] *See* doc. no. 1 (Complaint), ¶¶ 25-28.  Plaintiff's complaint does not explicitly mention the Fourth Amendment, but that provision, nevertheless, is the constitutional basis for this claim. In relevant part, the amendment provides that:  "The right of the people to be secure in *their persons*, houses, papers, and effects, against *unreasonable* searches and *seizures*, shall not be violated . . . ." U.S. Const. amend. IV (1791) (emphasis supplied).  The "incorporation" of the Fourth Amendment into the Due Process Clause of the Fourteenth Amendment and, thereby, its application to the various states of the Union, was finalized by the Supreme Court's decision in *Mapp v. Ohio*, 367 U.S. 643 (1961).  *See also, e.g., Ker v. California*, 374 U.S. 23 (1963); *Wolf v. Colorado*, 338 U.S. 25 (1949).

[68] *See* doc. no. 1 (Complaint), ¶¶ 15-17.

Officer Maher contends that the doctrine of qualified immunity shields him from liability for plaintiff's Fourth-Amendment, excessive-force claim. That doctrine provides "immunity from suit to governmental officials performing discretionary functions as long as 'their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Green v. Brantley*, 941 F. 2d 1146, 1148 (11th Cir. 1991) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The purpose of the doctrine is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *Lee v. Ferraro*, 284 F.3d 1188, 1193–94 (11th Cir. 2002). It protects from suit "all but the plainly incompetent or one who is knowingly violating the federal law." *Hope v. Pelzer*, 536 U.S. 730, 752 (2002) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *see also, e.g., Lee*, 284 F.3d at 1193–94; *Chesser v. Sparks*, 248 F.3d 1117, 1121–22 (11th Cir. 2001).

In order to be eligible to claim the benefits of the doctrine, however, the public official "must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988)). Officer Maher contends that he has done so,[69] and plaintiff has not argued

---

[69] *See* doc. no. 37 (Motion for Summary Judgment), at 16-17.

otherwise.[70]  Thus, "the burden shifts to the plaintiff to show that qualified immunity

is not appropriate."  *Lee*, 284 F.3d at 1194.

Courts generally apply a two-part test for determining whether a defendant is

entitled to claim the benefits of the doctrine of qualified immunity.  The "threshold

question" is:  Do the facts, viewed "in the light most favorable to the party asserting

the injury," show that the officer's conduct violated a constitutional right?  *Saucier*

*v. Katz*, 533 U.S. 194, 201 (2001).  If that question is answered "yes," then the court

will proceed to analyze the second part of the inquiry:  *i.e.*, was the right "clearly

established"?  *Id.*[71]

**1**.      *Did Maher's use of deadly force violate the Fourth Amendment?*

The Supreme Court has said that the use of deadly physical force when

attempting to apprehend a fleeing suspect "is a seizure subject to the reasonableness

requirement of the Fourth Amendment."  *See Tennessee v. Garner*, 471 U.S. 1, 7

(1985).  "The reasonableness of a particular use of force must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

---

[70] *See* doc. no. 41 (Response to Summary Judgment), at 19-20.

[71] The Supreme Court recently relieved lower courts from mandatory adherence to the order of the two-part analysis articulated in *Saucier*.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").  It is now within the court's discretion to, in appropriate cases, assume that a constitutional violation occurred for the purpose of addressing, in the first instance, whether such a violation would be "clearly established." *Id.*  Nevertheless, under the circumstances of this case, *Saucier's* tested sequence of analysis will be followed.

hindsight." *Long v. Slaton*, 508 F.3d 576, 580 (11th Cir. 2007) (internal citation and quotation marks omitted). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (alteration supplied); *see also, e.g., Whren v. United States*, 517 U.S. 806, 813 (1996) (holding that a court may not inquire into the actual motivations for the defendant's use of force; instead, the only appropriate question is whether a reasonable officer could have made the same decision); *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009) (holding that a court must "look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate").

The reasonableness inquiry "must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

An objective determination of the reasonableness of an officer's use of force requires an analysis of all circumstances. *See, e.g.*, *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013) (holding that a court must "pay 'careful attention to the

24

facts and circumstances' of the case, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight'") (quoting *Graham*, 490 U.S. at 396).[72]

More importantly, however, the Supreme Court recently held that, when a suspect's flight poses a grave risk to public safety, a police officer's use of deadly force to end that risk is reasonable. *Plumhoff v. Rickard*, — U.S. —, 134 S. Ct. 2012, 2022 (2014). The police in that case terminated a dangerous chase by firing fifteen shots at a suspect after his automobile collided with a police cruiser, came temporarily

---

[72] The Eleventh Circuit's *Morton* opinion held that

> a police officer may constitutionally use deadly force when the officer "(1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary *to prevent escape*; and (3) has given some warning about the possible use of deadly force, if feasible."

*Morton*, 707 F.3d at 1281 (emphasis supplied) (quoting *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009)). Although the second precondition listed in the *Morton* framework was qualified as "necessary to prevent escape," that is not accurate. The "necessity" at issue actually is "'the need to prevent 'serious physical harm, either to the officer or to others.'''" *Scott v. Harris*, 550 U.S. 372, 382 n.9 (2007) (quoting *Garner*, 471 U.S. at 11). Thus, in a police chase where the suspect is in a speeding automobile, the "necessity to prevent escape" satisfies the second precondition because the suspect's flight itself poses a threat of serious physical harm to others. *Id.* The *Morton* framework, however, is not the *sine qua non* for determining whether deadly force was reasonable. As the Eleventh Circuit has noted, *Morton's* analytical framework "says something about deadly force *but not everything*." *Long*, 508 F.3d at 580 (emphasis added). "The Supreme Court has cautioned that '[*Morton's* analytical framework] did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'''" *Id.* (quoting *Scott*, 550 U.S. at 382).

25

to a near standstill, and the suspect threw his vehicle into reverse in an attempt to escape. *Id.* at 2021.

This case is virtually indistinguishable from *Plumhoff*. Chris Jones, like the suspect in that case, posed a grave risk to public safety. The chase in this case exceeded 70 miles per hour at night and lasted just over five minutes. During the wild pursuit, Jones drove recklessly through residential areas and on poorly lit rural roads, passed a vehicle, failed to stop at five or six stop signs, swerved into the opposite lane of traffic on numerous occasions, drove into and out of a ditch, and disabled a police car by slamming on his brakes and allowing it to collide with his truck. It simply was fortuitous that, due to the time of night and the sparsely-populated rural areas in which the dangerous pursuit occurred, so few persons were endangered by Jones's conduct. Similar to the police officers in *Plumhoff*, at the time Maher fired his initial volley of shots, Jones had backed his truck onto the hood of Officer Shipp's cruiser, and come to a temporary standstill. Under the circumstances recorded by the officers' dash cameras, a reasonable officer could have concluded that Jones had transformed his truck into a deadly weapon, and was attempting to crush Officer Shipp. *See Pace v. Capobianco*, 283 F.3d 1275, 1281-82 (11th Cir. 2002) ("By the time of the shooting, Davis had used the automobile in a manner to give reasonable policemen probable cause to believe that it had become a deadly weapon with which Davis was armed.").

Just before Officer Maher fired his final shots, Jones sat up behind the wheel of his still-running truck.[73]  His sudden movement could have been viewed as an attempt to regain control of the truck.  Therefore, Officer Maher's reaction was reasonable.  He was not required to wait and see whether Jones intended to back his truck into and over Officer Shipp's patrol car yet again, or to leave the scene and, thereby, evade arrest.  *Cf. Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) ("Regardless of whether Jean-Baptiste had drawn his gun, Jean-Baptiste's gun [*read* "truck"] was available for ready use, and Gutierrez was not required to wait 'and hope[] for the best.'") (quoting *Scott v. Harris*, 550 U.S. 372, 385 (2007)) (first alteration supplied, second alteration in original).

Plaintiff contends that, unlike the chase in *Plumhoff*, "the pursuit of Chris Jones 'ended' by the time [Officer] Shipp, and then [Officer] Maher, began their initial volleys into Jones's truck, and certainly had 'ended' by the time [Officers] Shipp and Maher completed those volleys," because Jones's truck was hooked on Officer Shipp's push bumper.[74]  As previously determined, however, Chief Busken's opinion that Jones's truck was "disabled" is due to be excluded.  A reasonable officer at the scene, forced to make a split-second decision about whether he should shoot Jones, would have no way of knowing whether Jones intended — or was able — to resume

---

[73] *Id.* at 26. *See also* Exhibit J (Shipp Dash Cam), on file with the clerks office, at 5:44.

[74] Doc. no. 41 (Response to Summary Judgment), at 22 (alterations supplied).

his dangerous flight, or to shift his truck into reverse in another attempt to crush Officer Shipp.  *See Johnson v. Niehus*, 491 F. App'x. 945, 953 (11th Cir. Oct. 16, 2012) ("While, in retrospect, it may appear that Johnson's aggressive maneuvers were over after he pulled past Niehus, the officers, who were 'forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation' would not have known that.") (quoting *Graham*, 490 U.S. at 396-97).  Plaintiff's own expert testified that it was not unreasonable to believe that Jones would again attempt to back his truck into Officer Shipp's patrol car;[75] and he agreed that, as long as Jones was in the cab of his truck and behind the wheel with the motor running, he was capable of driving and, thereby, posed a risk to the public.[76]

Even if, as plaintiff contends, Jones's rear bumper was hooked onto Officer Shipp's push bumper, there is no guarantee that the push bumper would have remained attached to the patrol car if Jones had attempted to speed off, or that it would have remained intact and prevented Jones from backing his truck over the hood of Shipp's patrol car, possibly injuring (or crushing) him in the process.[77]

Thus, the record conclusively disproves [plaintiff's] claim that the chase

---

[75] Doc. no. 37-15 (Busken Deposition), at 81 ("I don't think it's unreasonable to think gosh, he's fixing to do that to them again.").

[76] *Id.* at 132.

[77] *See supra* Part III.E.

in the present case was already over when [Maher] began shooting. Under the circumstances at the moment when the shots were fired, all that a reasonable police officer could have concluded was that [Jones] was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road.

*Plumhoff*, 134 S. Ct. at 2021-22 (alterations supplied).[78]

Plaintiff attempts to distinguish this case from *Plumhoff*, based upon the fact that approximately seven and a half seconds elapsed between the end of Maher's initial volley and his final two shots.  However, if Maher was "justified in firing at [Jones] in order to end a severe threat to public safety, [he] need not stop shooting until the threat has ended." *Id.* at 2022 (alterations supplied).

The defendant police officers in *Plumhoff* fired fifteen shots during a ten-second span.  *Id.*  Here, Maher fired fifteen shots during an eleven-second span, albeit with a seven-and-a-half-second delay between his initial volley and the final two shots.[79] Although the Supreme Court noted that their holding in *Plumhoff* might be different *if* the police officers "had initiated a second round of shots after an initial round *had clearly incapacitated* [the suspect] and had ended any threat of continued flight, *or if*

---

[78] Plaintiff correctly notes that this court denied defendants' motion to dismiss, doc. no. 14 (Motion to Dismiss), because it could "infer that a suspect who was stopped and immobilized was not actively threatening the Officers or resisting arrest." Doc. no. 24 (Memorandum Opinion and Order Denying Motion to Dismiss), at 12.  However, this holding was based on "[p]laintiff's terse statement of facts," *id.* at 5 (alterations supplied), and, as this court noted, "the facts that come to light in discovery may ultimately tell a different tale." *Id.* at 12.

[79] Exhibit J (Shipp Dash Cam), on file with the clerks office, at 5:33-5:44.

[the suspect] *had clearly given himself up*," *id.* at 2022 (alterations supplied), there was no indication in this case that the first round of shots had incapacitated Jones. In fact, he sat up behind the wheel of his truck while it still was running. There also was no indication that Jones had "given himself up."

Other factors support Officer Maher's use of deadly force.

Even though Maher did not give a verbal warning of his intent to use deadly force if Jones did not surrender, courts "have 'decline[d] . . . to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing . . . .'" *Penley v. Eslinger*, 605 F.3d 843, 854 n.6 (11th Cir. 2010) (quoting *Carr v. Tatangelo*, 338 F.3d 1259, 1269 n.19 (11th Cir. 2003)) (alteration in original). At the time Maher began firing his initial volley of shots, Jones's truck had just rolled off Officer Shipp's hood.[80] In the time it would have taken Maher to give Jones a verbal command, Jones could have backed his truck over the hood of Officer Shipp's patrol car a second time, and seriously injured or killed him. Jones also could have driven away.

Plaintiff has not established that Officer Maher violated the Fourth Amendment.

**2.**   *Was the constitutional right that Maher allegedly violated "clearly established"?*

Even if this court had found a violation of the Fourth Amendment, Maher still

---

[80] Exhibit J (Shipp Dash Cam), on file with the clerks office, at 5:33.

would be entitled to summary judgment because plaintiff has not demonstrated that Maher violated a "clearly established" constitutional right.

In determining whether a constitutional right is clearly established, "'the salient question is whether the state of the law [at the time of the unconstitutional act] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" *Williams v. Consolidated City of Jacksonville*, 341 F.3d 1261, 1270 (11th Cir. 2003) (alterations in original) (quoting *Hope*, 536 U.S. at 741).   The Supreme Court has rejected the requirement that the facts of previous cases must always be "materially similar" to those facing the plaintiff.  *Hope*, 536 U.S. at 739.   Instead, for a constitutional right to be "clearly established,"

> its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  *This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful*, see Mitchell [*v. Forsyth*, 472 U.S. 511,] 535, n.12, 105 S. Ct. 2806, 86 L. Ed. 2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

*Hope*, 536 U.S. at 739 (emphasis supplied, alteration in original).

As the Eleventh Circuit has observed, there are various ways in which an officer may be placed on "fair warning" that his conduct in specific circumstances may violate the constitution or federal law.

First, the words of the pertinent federal statute or federal

31

constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances to overcome qualified immunity, even in the *total absence of case law*. This kind of case is one kind of "obvious clarity" case. For example, the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful.

Second, if the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, we then *turn to case law*. When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts. *See Marsh* [*v. Butler County*], 268 F.3d [1014,] 1031-32 n.9 [(11th Cir. 2001)]. For example, if some authoritative judicial decision decides a case by determining that "X Conduct" is unconstitutional *without tying* that determination to a particularized set of facts, the decision on "X Conduct" can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding "X Conduct" are immaterial to the violation. These judicial decisions can control "with obvious clarity" a wide variety of later factual circumstances. These precedents are hard to distinguish from later cases because so few facts are material to the broad legal principle established in these precedents; thus, this is why factual differences are often immaterial to the later decisions. But for judge-made law, there is a presumption against wide principles of law. And if a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so "with obvious clarity" to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.

Third, if we have no case law with a broad holding of "X" that is not tied to particularized facts, we then look at precedent *that is tied to the facts*. That is, we look for cases in which the Supreme Court or we, or the pertinent state supreme court has said that "Y Conduct" is unconstitutional in "Z Circumstances." We believe that most judicial precedents are tied to particularized facts and fall into this category. . .

32

> . When fact-specific precedents are said to have established the law, a
> case that is fairly distinguishable from the circumstances facing a
> government official cannot clearly establish the law for the
> circumstances facing that government official; so, qualified immunity
> applies. On the other hand, if the circumstances facing a government
> official are not fairly distinguishable, that is, are materially similar, the
> precedent can clearly establish the applicable law.

*Vinyard v. Wilson*, 311 F.3d 1340, 1350-52 (11th Cir. 2002) (emphasis in original,

alterations supplied). *See also Ashcroft v. al-Kidd*, — U.S. —, 131 S. Ct. 2074, 2083

(2011) ("We do not require a case directly on point, but existing precedent must have

placed the statutory or constitutional question beyond debate.").

It should also be emphasized that it is the plaintiff who bears the burden of

establishing that the constitutional right at issue was clearly established on the date of

its alleged violation. *Youmans v. Gagnon*, 626 F.3d 557, 562 (11th Cir. 2010).

In light of *Plumhoff*, and other cases involving police use of deadly force to stop

a fleeing felon involved in a high speed car chase, *see, e.g., Scott*, 550 U.S. at 381, and

*Brosseau v. Haugen*, 543 U.S. 194, 201 (2004), this is not an "obvious clarity" case.

Thus, the court must turn to case law to determine whether the purported

constitutional violation was clearly established at the time Officer Maher employed

deadly force against Chris Jones.

*Plumhoff* "makes plain that as of [July 18, 2004] — the date of the events at

issue in that case — it was not clearly established that it was unconstitutional to shoot

a fleeing driver to protect those whom his flight might endanger." *Plumhoff*, 134 S.

Ct. at 2023.

> To defeat immunity here, then, [plaintiff] must show at a minimum either
> (1) that [Officer Maher's] conduct in this case was materially different
> from the conduct in [*Plumhoff*] or (2) that between [July 18, 2004], and
> [March 21, 2011], there emerged either "'controlling authority'" or a
> "robust 'consensus of cases of persuasive authority,'" *al-Kidd*, *supra*, at
> 2084 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S. Ct. 1692, 143
> L. Ed. 2d 818 (1999); some internal quotation marks omitted), that
> would alter [the court's] analysis of the qualified immunity question.

*Plumhoff*, 134 S. Ct. at 2023 (alterations supplied).

Plaintiff does not contend that controlling authority emerged between July 18,

2004, the date of the events at issue in *Plumhoff*, and March 21, 2011, the date on

which Officer Maher fatally wounded Chris Jones.  Instead, she argues that Maher's

conduct was different from the conduct at issue in *Plumhoff*, because Chris Jones was

not fleeing at the moment Maher fired his final two shots.  Plaintiff contends that the

facts of this case are more like those of *Smith v. Mattox*, 127 F.3d 1416 (11th Cir.

1997), an excessive-force case in which the Eleventh Circuit found that an officer was

not entitled to qualified immunity.  In the latter case,

> [t]he plaintiff, Anthony Lee Smith, went to visit his mother one
> afternoon at her house in a dangerous neighborhood in Tuscaloosa,
> Alabama.  During the visit, he joined his teenage sister and several
> cousins at a picnic table in his mother's front yard.  Smith held a baseball
> bat while sitting at the table.
>
> On the same day, unbeknownst to Smith, a Tuscaloosa-area drug

34

task force planned to stage a reverse-sting operation to crack down on drug sales on the street where Smith's mother lived.  By coincidence, before the reverse-sting operation began, the police received a tip that three black males, whose clothing the informant described and two of whose names the informant provided, had cocaine in the front yard of Smith's mother's house.  The sting team accordingly stopped at the house and prepared to investigate.

The defendant Mattox, who was part of the team, entered Smith's mother's front yard.  Mattox did not identify himself as a police officer, although his clothing betrayed him as such.  Upon seeing Mattox, Smith raised the baseball bat in a threatening posture.  Mattox drew his gun to ready position and ordered Smith to drop the bat.  Smith did not, and Mattox threatened to shoot.  Smith then dropped the bat and ran through the backyard, down a driveway, and into a street running behind the house.  Once in the street, Smith turned around, thinking that the threat from Mattox had passed, and started back toward the house.  Meanwhile, however, Mattox had pursued Smith to the driveway, and other officers had also pulled up on the driveway side of the house.

In the driveway, Smith came face to face with Mattox.  After first pretending to run again, Smith docilely submitted to arrest upon Mattox's request for him to "get down."  Once Smith was on the ground, Mattox put his knee on Smith's lower back to prepare to handcuff him.  In the process of pulling Smith's left arm behind his back to fasten the handcuffs, Mattox put Smith's forearm to a position that caused Smith discomfort.  Smith complained, and then with a grunt and a blow — but no sign of anger — Mattox broke Smith's arm.

*Id.* at 1417-18 (alteration supplied).  Based upon these facts, the Eleventh Circuit held

that, even though some use of force was reasonable,

assuming as we must that Smith was offering no resistance *at all*, the considerable effort and force inferable from the grunt, Smith's sensation of a blow, and the broken arm was obviously unnecessary to restrain even a previously fractious arrestee. We thus conclude that this case falls within the slender category of cases in which the unlawfulness of the

35

conduct is readily apparent even without clarifying caselaw.

*Id.* at 1420 (emphasis in original).

This court disagrees with plaintiff.  The facts of this case are not at all like those at issue in *Smith*.  Here, there was no indication that Chris Jones had given himself up, or that he was incapacitated, at the moment Maher fired his final two shots.[81]  Indeed, in *Smith*, the plaintiff had docilely submitted to arrest by lying face down on the ground.  Moreover, he had abandoned his deadly weapon (the baseball bat).  In contrast, Chris Jones suddenly sat up behind the steering wheel of his truck while its engine was still running.  "Under the circumstances at the moment when the shots were fired, all that a reasonable police officer could have concluded was that [Jones] was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road."  *Plumhoff*, 134 S. Ct. at 2021-22 (alteration supplied).

For these reasons, even if it were to be determined that Officer Maher's final two shots violated Chris Jones's Fourth Amendment right to be free of unreasonable force, Maher still would be entitled to summary judgment based on the doctrine of qualified immunity because plaintiff has not demonstrated that the right was "clearly established" on the date the deadly force was applied.

---

[81] *See supra* Part IV.A.1.

**B**.    **Wrongful Death Claim**

The remaining claim is plaintiff's supplemental state-law claim for wrongful death.  In cases where the court's jurisdiction is based solely upon a federal question, the district court has discretion to entertain state claims that are supplemental to the federal claim.  *See* 28 U.S.C. § 1367(a).  The district court may decline to exercise supplemental jurisdiction when:

> (1)    the claim raises a novel or complex issue of state law,
>
> (2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3)    *the district court has dismissed all claims over which it has original jurisdiction*, or
>
> (4)    in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (emphasis supplied).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 350 n.7 (1988).

Here, plaintiff's federal claim has been eliminated.  Accordingly, this court declines supplemental jurisdiction over the remaining state law claim, and exercises its discretion to dismiss that claim, but without prejudice to plaintiff's right to reassert

37

it in an appropriate state forum, if she desires to do so.

## IV.  CONCLUSION

A separate order, consistent with this memorandum opinion, will be entered contemporaneously herewith.

**DONE** this 28th day of October, 2014.

_____
United States District Judge

**APPENDIX**
**Written Report of Daniel Busken**
(Doc. no. 41-5)

---

**Events Preceding the Use of Force**

OPINION #1

I reviewed video of this incident many times and was "troubled" by what I watched. Throughout the incident, the police officers used tactics bringing them too close to Jones.  Albertville Police Department policy (p. 50) clearly defines Reaction Time and Reactionary Gap:

   E.   Reaction Time: the officer must consider that action is faster than reaction; thus the officer must pay attention to the above factors when preparing for a course of action.[82]

   F.   Reactionary Gap: officers should be cognizant of, and utilize a reactionary gap during all police contacts.  The reactionary gap is defined as a safety zone between the officer and subject which affords the officer more time to react to aggression:

      1.   The average distance is six feet or more;

      2.   Varies with type of weapon the subject may possess;

---

[82] Busken's report does not include the "above factors" mentioned in Section E of the "Variables that Affect the Force Continuum" in the Albertville Police Department Policies and Procedures Manual.  Those factors are:

   A.   Officer/Subject: size, physical abilities;

   B.   Environment Conditions: such as close or confined areas;  [and]

   C.   Nature of contact[.]

Doc. no. 40 (Albertville Police Department Policies and Procedures Manual), at ECF 76 (alterations supplied).

3.   The officer always has two "Reactionary Options" available:

    a.   Penetrate the gap to attempt control;

    b.   Disengage to create distance.

Literature on emergency vehicle operations also identifies the need for reaction time and a reactionary gap during a police pursuit.  According to Beach, Morris & Smith (1993), "Safety Considerations When Pursuing — Always leave yourself an out.  Try to maintain a space cushion around your vehicle.  Your following distance should increase as speeds increase.  A gap of approximately 4 seconds should allow you to maintain contact safely." According to Albertville's Lethal Force policy (p. 49), "Lethal Force is considered a measure of "Last Resort" [*sic*].  Had the officers allowed more distance between them and Jones they would have probably had other options.

Officer Isbell's police vehicle was too close to Jones' truck during the pursuit.  This prohibited Officer Isbell from reacting to Jones' maneuvers and avoiding a collision.  Later in the incident, when Jones stopped the truck, Officer Shipp was too close to Jones' truck, leaving Shipp with no Reactionary Gap.  Some may argue this portion of policy is not relevant during a vehicular pursuit; however, the Albertville policy clearly states Reaction Time and Reactionary Gap are relevant "during all police contacts".

OPINION #2

The primary question regarding a police pursuit is:  Does the need to apprehend the suspect outweigh the danger associated with continuing the pursuit? Three Albertville police officers responded to the scene of this incident.  I believe one of the officers should have stayed at the scene and gathered information.  This opinion is reinforced by a statement from Officer Shipp's deposition, "We pursued him in an attempt to get him to stop and try to figure out what was going on at the residence" (p. 19).  This officer could have identified Jones and identified the location of his residence.  These details could have been provided via radio to the two pursuing officers.  The officer at the scene would have also confirmed Jones was impaired/intoxicated, which may have explained Jones' erratic driving behavior.  Additionally, this officer, through the course of gathering details, may have learned Jones was no longer armed with the knife.  During the pursuit, the dispatcher is heard saying, "We got the caller on the line

— we know she's ok." All of this information would have been helpful for the pursuing officers and any supervisory personnel monitoring the pursuit with regard to decisions about continuing the pursuit and actions leading to the use of lethal force.

**Actions of Offender**

OPINION #1

Albertville Police Department policy regarding Use of Lethal Force (p. 49) allows Lethal Force as a measure of "Last Resort".

    A.    AUTHORIZED USE OF LETHAL FORCE

        1.    To protect the officer or another from what is reasonably believed to be an immediate threat of death or serious physical injury;[83]

---

[83] Busken's report does not include the full text of Section A of the "Lethal Force Procedures" in the Albertville Police Department Policies and Procedures Manual. That Section provides:

    A.    AUTHORIZED USE OF LETHAL FORCE
    The use of Lethal force is considered a measure of "Last Resort" as defined under section II.E. and is limited to the following situations:

        1.    To protect the officer or another from what is reasonably believed to be an immediate threat of death or serious physical injury;

        2.    To prevent the escape of a subject who is fleeing from an inherently violent felony crime, and the officer has probable cause to believe that the subject poses a significant threat of death or serious physical injury to the officer or others;

        3.    Whenever any one of the two conditions described above are present, where feasible, officers shall identify themselves and provide a warning before the force is applied.

Doc. no. 40 (Albertville Police Department Policies and Procedures Manual), at ECF 75. The court cannot locate "section II.E." in the record.

Review of the video from Officer Shipp's patrol vehicle shows Jones back his truck into the front of Shipp's vehicle. While the police vehicle is stationary, the truck continues and the rear of the truck "rides up" slightly onto the push-bumper and hood of Shipp's patrol car. The push bumper stopped the backward motion of Jones' truck, disabled Jones' truck preventing it from continuing its backward movement, and ended the immediate threat of death or serious physical injury. Jones' truck appears to be stuck on the push bumper preventing the truck from moving backward any further. Both Officer Shipp and Officer Maher acknowledge this in depositions:

Officer Shipp:

1.   Q.   All right. Was he stuck on your car?

     A.   Yes, sir.

     Q.   He wasn't going anywhere?

     A.   Didn't seem to be (p. 42),

2.   Q.   Do you know if the vehicles ever did become hooked together?

     A.   They did (p. 84).

Officer Maher:

1.   Q.   But it had gone forward from its furthest point back?

     A.   The best perspective that I had of it, which was sitting next to vehicle at the time that the actual shooting occurred, it appeared to me that the push bumper had actually pushed the truck forward (p. 13).

2.   Q.   Was it — by the time, though, that you're out of the vehicle, is it stuck on the push bumper?

     A.   Yes, it is (p. 25).

Jones' truck then moves forward disengaging contact with Shipp's vehicle. Shipp's

patrol car video shows the white (reverse gear) lights illuminated on Jones' truck as Jones backed into the front of Shipp's patrol car;  however, as Jones' truck moves forward the white lights go off indicating the truck is no longer in reverse gear.

### Actions of Officer(s)

OPINION #1

ABI Agent Investigative Summary File Number 2C-0486-96-2011 prepared by Agent Terry Thomas includes a statement attributed to Shipp.  According to Agent Thomas, Shipp stated he shot until the truck stopped coming toward him (p. 1).  However, Shipp's in-car camera clearly shows that Officer Shipp begins the use of lethal force (shooting) after the push bumper disables the truck, after Jones' truck is disengaged from the front of the patrol vehicle, and after the immediate threat of death or serious injury subsided.

This raises several questions:

1.     Did Officer Shipp have other options he could have used prior to using lethal force?

Again, according to Albertville policy, Shipp could "Disengage to create distance".  This then "affords the officer more time to react to aggression" and in my opinion gives the officer(s) time to contemplate options other than Lethal Force.

2.     Could Officer Shipp and Officer Maher have used some other technique to end this encounter without using Lethal Force?

According to training records provided by the Albertville Police Department, both Shipp and Maher attended training in Pursuit Termination Techniques (Source — Training Certificates dated August 12, 2010).  Although the description of this course and course curriculum was not included in the materials I reviewed, I assume this course would have provided participants with options other than Lethal Force to end this sort of encounter.  In his deposition (p. 22), Officer Shipp indicated he has an understanding of the unpredictable nature associated with pursuits when he said, "Typically they end with the offender either wrecking or running out of gas. Occasionally they just decide they want to pull over, but typically they wreck for the most part, probably."

Some of the other options available to Officer(s) Shipp and Maher would have been:

    A.     Disengage to create distance.

    B.     Exit police vehicles and take a cover position.

    C.     Order Jones to exit the truck.

    D.     Order Jones to show his hands.

    E.     Order Jones to throw his keys out of the vehicle.

Officer Shipp was aware of these options according to his deposition (p. 42-43). Shipp was asked, what would your training teach you to do when, at the end of a chase, a vehicle is disabled now and can't go anywhere?  Shipp replied, "You either make verbal communications with the suspect and order them to get out of the vehicle. Or you can approach the vehicle and remove the suspect from the vehicle that way."

3.     Was the use of Lethal Force by Officer Shipp reasonable?

I do not think the lethal force used by Officer Shipp was reasonable because Jones backed into the strongest part of the police car.  Officer Maher reinforced this opinion in his deposition.  "You cannot disable a vehicle by shooting at the engine block, it's the strongest part on the vehicle" (p. 58).  Jones backed into the engine compartment. The front of Shipp's police vehicle was fortified by what is referred to as a "push bumper".  Shipp was aware of the protection provided by a push bumper.  In his deposition, referring to the push bumper, Shipp said, "It's a metal push bar that we use to — that kind of protects the front end of the car" (p. 84).  A manufacturer website, Go Rhino — Public Safety Division (www.gorhinopd.com/testimonials.aspx), offers several testimonials of police officers throughout the United States.  These stories prove the push bumper absorbs a lot of the impact, allowed an officer to walk away from a head-on collision, and another push bumper saved the officer from serious injury or death.

I do not think the lethal force used by Officer Shipp was reasonable because of conflicting statements in his deposition.  Shipp was asked, was the truck coming at you when you shot towards it? Shipp responded, "Yes, sir" (p. 34).  Shipp's in-car camera clearly shows that Officer Shipp begins the use of lethal force (shooting) after

the push bumper disables the truck, after Jones' truck is disengaged from the front of the patrol vehicle, and after the immediate threat of death or serious injury subsided. Shipp was asked about this later in the deposition (p. 38), ["]So if the video is correct, you didn't shoot until he put it back in drive and went forward, is that right?["] Shipp replied, "Seems to be per the video, yes, sir."

4.      Was the Use of Lethal Force by Officer Maher reasonable?

I do not think Officer Maher's use of lethal force was reasonable because, according to Maher's deposition (p. 21), the sole reason Maher fired at Jones was because Maher believed Jones presented a threat to Officer Shipp.  Jones was backing his truck up onto Shipp's police vehicle.  Maher's account is contrary to the video evidence. Shipp's in-car camera clearly shows Officer Maher begin the use of lethal force (shooting) after the truck is disabled by the push bumper, after the truck is disengaged from the front of the patrol vehicle, and after the immediate threat of death or serious injury subsided.

I also do not think the lethal force used by Officer Maher was reasonable because, as noted earlier in this report, Albertville Police Department policy regarding Use of Lethal Force (p. 49) only allows Lethal Force as a measure of "Last Resort"

A.      AUTHORIZED USE OF LETHAL FORCE

1.      To protect the officer or another from what is reasonably believed to be an immediate threat of death or serious physical injury;[84]

Apparently, Officer Maher began his use of lethal force, not because Maher perceived any threat posed by Jones, but because he heard gunshots behind him and Maher thought the shots were coming from Officer Shipp (ABI Agent Investigative Summary File Number 2C-0486-96-2011 p. 2).   During the ABI investigation, the only justification Maher provided for the final two shots Maher fired as Maher approached the driver's door of Jones' truck was because the driver (Jones) tried to sit back up. Maher was asked about this in his deposition (p. 37).  Maher answered, "Yes" to the question, "You shot him because he was still alive?["] This was not a "split second" decision according to Maher's deposition (p. 53), "His life was in definite danger.  I

84 See supra note 84.

45

had about three seconds to make that decision and I made [the] decision based on that."

During Maher's deposition (p. 37), Maher cites his training as justification for his use of lethal force.

> "We are taught in any circumstances whatsoever involving deadly force to eliminate the threat.  You don't shoot to wound, you don't shoot to do anything along those lines over there.  We are academy trained and ever[y] bit of training that I've ever had to shoot to stop the threat."

Again, I would emphasize I do not think Maher's use of lethal force was reasonable because Shipp's in-car camera clearly shows Officer Maher begin the use of lethal force (shooting) after the truck is disabled, after the truck is disengaged from the front of the patrol vehicle, and after the immediate threat of death or serious injury subsided.

### Outcome with regard to Department Policy and Relevant Laws

OPINION #1

Members of Albertville's Firearms Discharge Review Committee were in unanimous agreement that the actions of both Officer Shipp and Officer Maher are justified and are deemed In Policy (Committee Findings dated March 24, 2011)[.]  Although I understand the points noted by this Committee in their report, I believe the findings are debatable, based upon opinions noted previously in my report.  Furthering my opinion these results are debatable is a recent case from Garland, Texas.  According to the Dallas Morning News, a Garland, Texas police officer was fired following an investigation into an August 31, 2012 chase in which the officer shot 41 times at a suspect the officer believed was armed.  The Garland officer believed the suspect posed a threat, however, the suspect was unarmed.

### Conclusion

The use of deadly force to stop Jones from continuing to back the truck over Officer Shipp's patrol car would have been reasonable.  However, the push bumper disabled Jones' truck, stopped the backward motion of Jones' truck, and ended the immediate threat of death or serious physical injury.  The truck then moved forward and

disengaged from Shipp's patrol vehicle furthering my belief the immediate threat of death or serious physical injury subsided.  Additionally, the white (reverse gear) lights go off indicating the truck is no longer in reverse gear.   We have no way of determining what Jones' intentions were at this point, but one thing is certain, Jones was not provided the opportunity to surrender.